COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
 2-08-295-CV

 

 

IN THE
INTEREST OF E.J.C. AND R.A.C., 

THE CHILDREN

 

 

 

                                              ------------

 

            FROM THE 362ND
DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------








Andrew H. appeals from the trial court=s order
terminating the parent-child relationship between him and two of his children,
Amy and Bobby (both pseudonyms).  In
twenty-one issues, Andrew challenges the legal and factual sufficiency of the
evidence to support termination under family code section 161.001(1)(D), (E),
(F), and (N) and the jury=s best-interest findings and
argues that delayed service of process deprived him of his right to due
process.  We affirm.

                                            Background

Amy and Bobby are the biological children of
Andrew H. and Yolanda C.  Amy and Bobby
were born on January 3, 2001, and June 10, 2003, respectively.  At the time of the termination proceedings,
Amy was seven and Bobby was five. 
Although the trial court also terminated Yolanda=s
parental rights, this appeal concerns only Andrew=s
relationships with Amy and Bobby.

Andrew testified that Amy and Bobby were born
when he and Yolanda lived together.  He
said that during his relationship with Yolanda, he abused alcohol, which Ainterfered
with everything@ and caused him to suffer Ablackouts.@  He testified that he snorted and injected
cocaine several times but stopped because he Adidn=t like
it.@  Andrew admitted that he and Yolanda both used
cocaine while caring for Amy.  He also
said that he occasionally let the children stay with their maternal
grandmother, Virginia S., whom he knew to be a cocaine user.








Yolanda testified that while she and Andrew lived
together, they both used cocaine Aalmost
every day.@ 
Yolanda testified that Andrew used cocaine in Amy=s
presence, and she recounted an incident when Andrew once left a needle on the
bathroom counter when Amy was two years old. 
She added that Andrew drove under the influence of cocaine with both
children in the vehicle.  She also stated
that Andrew drank alcohol daily throughout the relationship, often to the point
of passing out.

Yolanda testified that Andrew physically abused
her by punching, slapping, and kicking her Aalmost
every day@ in the children=s
presence.  She stated that Andrew hit her
multiple times during both pregnancies and once threw a night stand at her
while she was pregnant with Bobby. 
Andrew denied having abused Yolanda, although he admitted that he raised
his voice and Aprobably did@ push
her.

Yolanda also testified that Andrew was
emotionally abusive and told her she Awas no
good,@ Awas [a]
no good mother,@ and Acouldn=t make
it without him@ in front of Amy on several
occasions, causing Amy to cry.  Yolanda
claimed that Andrew often yelled at Amy as well.








Andrew testified that Yolanda moved out in April
2004 and took the children with her.  He attributed
the breakup to Yolanda=s turning twenty-one, at which
point she began frequenting clubs and neglecting the children.  Yolanda testified that after she moved out,
Andrew threatened to kill her and the children; as a result, she obtained a
protective order against Andrew, and he pleaded guilty to making a terroristic
threat.  Andrew said that after Yolanda
left, he saw her once in December 2004 but never spoke with her again, though
he said he tried to contact her every three months.  He had no contact with the children after
Yolanda moved out and said, AI just
leave [the] kids with [Yolanda=s
mother].@  Andrew said that Yolanda eventually moved
without telling him where she was going, so he lost contact with the children.

In January 2007, the Texas Department of Family
and Protective Services (Athe Department@)
removed the children and their younger half-sister, Carrie (a psuedonym), from
Yolanda=s home
in response to an allegation that Yolanda and Carrie=s
father, Daniel H., were neglecting and abusing the children.  The Department instituted termination
proceedings in January 2007, seeking to terminate Andrew=s,
Yolanda=s, and
Daniel=s
parental rights.  The Department did not
serve Andrew with process until December 2007; we will describe the
circumstances surrounding the delayed service later in this opinion.








Andrew testified that he first learned when he
was served with process that the Department had removed the children and placed
them in Virginia=s (Yolanda=s mother=s)
home.  He said he went to Virginia=s house
to see the children immediately after being served.  The Department later removed the children
from Virginia=s home, and Andrew said that he
saw the children Amaybe@ five
times during the pendency of the suit. 
Department caseworker Patricia Mosqueda testified that Andrew attended
only three of the nine Department-scheduled visitations with his children.  Andrew said that he missed scheduled
visitations because of his work schedule. 
He said his inability to see the children made them Asad;
they missed me.@

Andrew claimed that he now abstains from alcohol,
although he wrote on an Internet web page that he is a Asocial
drinker.@[2]  Andrew sought to have the children placed in
the home he shared with his current wife, Sandra, and her two children, but he
admitted having told a Department employee that Sandra was unwilling to share
in the responsibility of caring or providing for Amy and Bobby.  Andrew testified that his marriage to Sandra
was solid, but he also admitted that he had posted personal advertisements on
several web sites, seeking sexual encounters with other women.[3]

Andrew=s adult
daughter from a prior marriage, Anna H., testified that Andrew is currently
supportive of her son, who calls him AGrandpa.@  Anna testified that if Andrew=s rights
were not terminated, she would assist in raising Amy and Bobby.  Anna denied ever having seen Andrew hit
Yolanda or any other domestic violence. 
But she said that Andrew probably abused prescription medications before
the children were born.








Caseworker Mosqueda testified that the Department
provided a service plan with a goal of family reunificationCwhich
required a drug and alcohol assessment, counseling, and parenting classesCand
arranged visits between Andrew and the children.  She stated that Andrew initially refused to
submit to drug testing, though later drug tests came back negative.  Mosqueda said that the Department planned on
Amy and Bobby remaining with their half-sister, Carrie.

Christine Snow, the children=s CASA
caseworker, testified that during a telephone conversation with Andrew, his speech
was noticeably slurred, despite his claiming he was alcohol-free.  Snow testified that the children never
mentioned their father prior to his visitations, and she advised that
terminating Andrew=s parental rights would serve
the children=s best interests.

James Latham, a licensed psychotherapist,
testified that he oversaw Andrew=s
counseling at the Department=s
request and met with Andrew seven times. 
Regarding Andrew=s Internet sex ads, Latham
stated that generally, such postings are often Afantasy@;
however, after reading the postings, he responded that they Acertainly
would raise some concerns@ about Andrew=s
relationship with Sandra.








Latham described Andrew=s
cocaine and alcohol abuse as Amodest@ and Aunder
control,@
respectively, and said that Andrew still Adrinks
socially.@ 
Latham stated that although Andrew gets Aa little
hot headed at times,@ he was not abusing his
children.  But he said that a history of
physical abuse Awould not surprise [him]@ and
that he knew Andrew had battered Yolanda in Amy=s
presence.

Latham stated that, at present, Andrew was Aadequately@
parenting Sandra=s children, who lived with him
and Sandra.  Latham also said that, as a
counselor, he believed Andrew could provide a safe environment and could parent
Amy and Bobby without problems.

Beverly Bailey, an employee with the district
attorney=s office
and a licensed professional counselor, testified that although Athere
are different schools of thought@ on the
issue, children under the age of three who witness domestic abuse may develop Abonding
issues, attachment issues, [and] trust issues.@  Bailey also testified that a parent=s
absence Awould in
fact impact that relationship, because they wouldn=t have
that closeness@ and that Athere is
a lot that is lost@ when a parent is absent.  She testified that home instability can
create future problems, such as Anot
eating, not sleeping, crying,@ and Apsychosomatic
symptoms@ in
preschool children.








Andrew=s case
was tried to a jury in late June 2008.[4]  The jury found that Andrew had violated
paragraphs (D), (E), (F), and (N) of family code section 161.001(1) and that
termination was in Amy=s and Bobby=s best
interest.  See Tex. Fam. Code Ann.
'
161.001(1)(D), (E), (F), (N), (2) (Vernon 2008).  The trial court terminated Andrew=s
parental rights and appointed the Department as their permanent managing conservator.  Andrew filed this appeal.

                                       Standard
of Review








A parent=s rights
to Athe
companionship, care, custody, and management@ of his
or her children are constitutional interests Afar more
precious than any property right.@  Santosky v. Kramer, 455 U.S. 745, 758B59, 102
S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex.
2003).  In a termination case, the State
seeks not just to limit parental rights but to erase them permanentlyCto
divest the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right
to inherit.  Tex. Fam. Code Ann. '
161.206(b) (Vernon Supp. 2008); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.
1985).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Holick,
685 S.W.2d at 20B21; In re M.C.T., 250
S.W.3d 161, 167 (Tex. App.CFort
Worth 2008, no pet.).

In proceedings to terminate the parent‑child
relationship brought under section 161.001 of the family code, the petitioner
must establish one ground listed under subdivision (1) of the statute and must
also prove that termination is in the best interest of the child.  Tex. Fam. Code Ann. '
161.001; In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human Servs. v. Boyd, 727
S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear
and convincing evidence.  Tex. Fam. Code
Ann. ''
161.001, 161.206(a).  Evidence is clear
and convincing if it Awill produce in the mind of the
trier of fact a firm belief or conviction as to the truth of the allegations
sought to be established.@ 
Id. ' 101.007 (Vernon
2002).  Due process demands this
heightened standard because termination results in permanent, irrevocable
changes for the parent and child.  In
re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see In re J.A.J.,
243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and
modification).








When reviewing the evidence for legal sufficiency
in parental termination cases, we must determine whether the evidence is such
that a factfinder could reasonably form a firm belief or conviction that the
grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005). 
We must review all the evidence in the light most favorable to the
finding and verdict.  Id.  This means that we must assume that the
factfinder resolved any disputed facts in favor of its finding if a reasonable
factfinder could have done so.  Id.  We must also disregard all evidence that a
reasonable factfinder could have disbelieved. 
Id.  We must consider,
however, undisputed evidence even if it is contrary to the finding.  Id. 
That is, we must consider evidence favorable to termination if a
reasonable factfinder could and disregard contrary evidence unless a reasonable
factfinder could not.  Id.

We must therefore consider all of the evidence,
not just that which favors the verdict.  Id.  But we cannot weigh witness credibility
issues that depend on the appearance and demeanor of the witnesses, for that is
the factfinder=s province.  Id. at 573, 574.  And even when credibility issues appear in
the appellate record, we must defer to the factfinder=s
determinations as long as they are not unreasonable.  Id. at 573.








In reviewing the evidence for factual
sufficiency, we must give due deference to the factfinder=s
findings and not supplant the judgment with our own.  In re H.R.M., 209 S.W.3d 105, 108
(Tex. 2006).  We must determine whether,
on the entire record, a factfinder could reasonably form a firm conviction or
belief that the parent violated the relevant conduct provision of section 161.001(1)
and that the termination of the parent-child relationship would be in the best
interest of the child.  In re C.H.,
89 S.W.3d 17, 28 (Tex. 2002).  If, in
light of the entire record, the disputed evidence that a reasonable factfinder
could not have credited in favor of the finding is so significant that a
factfinder could not reasonably have formed a firm belief or conviction in the
truth of its finding, then the evidence is factually insufficient.  H.R.M., 209 S.W.3d at 108.

                                             Discussion

1.               
Grounds
for termination

In
his first eight issues, Andrew argues that the evidence is legally and
factually insufficient to support the jury=s endangering-environment and endangering-conduct findings
under sections 161.001(1)(D) and (E).  See
Tex. Fam. Code Ann. ' 161.001(1)(D), (E).








Endangerment
means to expose to loss or injury, to jeopardize.  Boyd, 727 S.W.2d at 533; In re
J.T.G., 121 S.W.3d 117, 125 (Tex. App.CFort Worth 2003, no pet.); see also In re M.C., 917
S.W.2d 268, 269 (Tex. 1996).  To prove
endangerment under subsection (D), the Department had to prove that Andrew (1)
knowingly (2) placed or allowed his children to remain (3) in conditions or
surroundings that endangered their physical or emotional well‑being.  See Tex. Fam. Code Ann. ' 161.001(1)(D).  Under subsection (E), the relevant inquiry is
whether evidence exists that the endangerment of the children=s physical well‑being was the
direct result of Andrew=s conduct, including acts, omissions,
or failures to act.  See Tex. Fam.
Code Ann. ' 161.001(1)(E); J.T.G.,
121 S.W.3d at 125.  Additionally,
termination under subsection (E) must be based on more than a single act or
omission; a voluntary, deliberate, and conscious course of conduct by the
parent is required.  J.T.G., 121
S.W.3d at 125; see Tex. Fam. Code Ann. ' 161.001(1)(E). 
However, it is not necessary that the parent=s conduct be directed at the children
or that the children actually suffer injury. 
Boyd, 727 S.W.2d at 533; J.T.G., 121 S.W.3d at 125.  The specific danger to the children=s well‑being may be inferred
from parental misconduct standing alone. 
Boyd, 727 S.W.2d at 533; In re R.W., 129 S.W.3d 732, 738
(Tex. App.CFort Worth 2004, pet. denied).  To determine whether termination is
necessary, courts may look to parental conduct occurring both before and after
the children=s birth.  In re D.M., 58 S.W.3d 801, 812 (Tex.
App.CFort Worth 2001, no pet.).








Stability
and permanence are paramount in the upbringing of children.  See In re T.D.C., 91 S.W.3d 865, 873
(Tex. App.CFort Worth 2002, pet. denied).  A factfinder may infer from past conduct
endangering the well‑being of the children that similar conduct will
recur if the children are returned to the parent.  See In re D.L.N., 958 S.W.2d 934, 941
(Tex. App.CWaco 1997, pet. denied), disapproved
on other grounds by J.F.C., 96 S.W.3d at 256, and C.H.,
89 S.W.3d at 17.

In
this case, Yolanda testified that Andrew regularly abused her when he lived
with her, including hitting her with his closed fist, kicking her, slapping
her, and throwing a night stand at her. 
She said that he abused her when she was pregnant with Bobby and
sometimes in Amy=s and Bobby=s presence.  She also said that he verbally abused her in
front of the children.  When Yolanda left
Andrew in 2004, he threatened to kill her and the children; Andrew later pleaded
guilty to making a terroristic threat.








Yolanda
testified that Andrew drank heavily and daily; Andrew testified that he drank
to the point of blacking out.  Andrew
gave conflicting testimony about when he had last had a drink; at one point, he
testified that he had not had a drink in a year and a half and that he did not
drink at all anymore, but he also testified that his last drink had been on the
previous New Year=s Eve, i.e., seven months before
trial.  His psychotherapist testified
that Andrew still drank socially, and evidence admitted for impeachment showed
that Andrew had written in Internet chat rooms that he still drank occasionally
and socially.  A Department caseworker
testified that Andrew=s speech sounded slurred when she
called him two months before trial.

Yolanda
also testified that Andrew had snorted cocaine; that after Amy=s birth he began to inject cocaine;
that he used cocaine when Amy and Bobby were around; and that he left a needle
on the bathroom counter when Amy was two years old.  Andrew admitted that he had used cocaine
after Amy was born, about five years before trial, but he said that he had only
used cocaine three or four times and that he did not like it.

The
record also shows that Andrew knew the children were in a dangerous environment
after Yolanda left him.  Andrew told a
caseworker that his relationship with Yolanda ended because she was Ajust crazy@ and drank and partied too much, but
he made no effort to rescue the children from her care or obtain custody of
them after Yolanda left.  He also
testified that he had left the children in the care of Yolanda=s mother despite his concern that she
was buying and using cocaine in her home.








Andrew
argues that Yolanda=s testimony about physical and verbal
abuse and drug and alcohol use is not legally or factually sufficient to
support the jury=s endangerment findings because she
was the only witness to so testify.  But
the trier of fact may believe all, part, or none of the testimony of any
witness.  In re T.N., 180 S.W.3d
376, 382B83 (Tex. App.CAmarillo 2005, no pet.).  The jury could, and evidently did, believe
Yolanda=s testimony and resolve the conflicts
between her testimony and Andrew=s against him.  See
id.; see also In re R.W., 129 S.W.3d 732, 738 (Tex. App.CFort Worth 2004, pet. denied)
(stating that the factfinder=s function Ais to judge the credibility of the
witnesses, assign the weight to be given their testimony, and resolve any
conflicts or inconsistencies in the testimony@).








Andrew
also contends that evidence of events that transpired when he lived with
Yolanda is too remote to prove endangerment, citing Wetzel v. Wetzel,
715 S.W.2d 387, 390B91 (Tex. App.CDallas 1986, no pet.).  In Wetzel, the Dallas court held that
evidence showing that a mother had abused her children four years before trial
was insufficient to prove endangerment at the time of trial because the record
showed that the mother was suffering from mental disorders at the time of the
abuse and that her mental disorders had since been cured and there was no
evidence that she abused the children at the time of trial or might do so in
the future.  Id.  Our case is distinguishable on several
grounds.  First, there is no evidence
that Andrew suffered from a mental condition that caused him to abuse Yolanda
and from which he could be cured.  There
was evidence that Appellant had used drugs in the past and was addicted to
alcohol in the past, a condition from which a person can Arecover,@ but there was also evidence that
Andrew still drank alcohol, and the jury could have believed that he was not Ain recovery.@  
Thus, unlike the mother in Wetzel, we cannot say that all of
Andrew=s problems existed in the remote
past.  Further, even if the evidence
showed that Andrew had recovered from his drug use and alcohol addiction,
nothing in the record ties his drug and alcohol use to his physically abusing
Yolanda, apart from Andrew=s testimony that he was frequently inebriated
during his relationship with Yolanda. 
Second, the fact that Andrew=s abusing Yolanda stopped four years before trial is not
because he was Acured,@ like the mother in Wetzel, but because Yolanda left
him and he no longer had access to her or to the children.  Under the circumstances of this case, the
jury was free to infer from Andrew=s past conduct that similar conduct would recur if the
children were returned to him.  See In
re D.L.N., 958 S.W.2d at 941.








Viewing
the evidence in the light most favorable to the jury=s verdict, we hold that the jury
could reasonably have formed a firm belief or conviction that Andrew placed or
knowingly allowed the children to remain in endangering conditions or
surroundings and engaged in endangering conduct or knowingly left the children
with persons who engaged in endangering conduct.  See Tex. Fam. Code Ann. '161.001(1)(D), (E).  Thus, the evidence was legally sufficient to
support the jury=s endangering-conditions and
endangering-conduct findings.  See In
re J.P.B., 180 S.W.3d at 573. 
Viewing the entire record, we hold that a factfinder could reasonably
form a firm conviction or belief that Andrew violated paragraphs (D) and (E);
thus, the evidence is also factually sufficient.  See In re C.H., 89 S.W.3d at 28.  We overrule Andrew=s first through eighth issues.

Because
a finding that a parent violated a single provision of section 161.001(1), when
coupled with a finding that termination is in the children=s best interest, is sufficient to
support termination, we need not consider Andrew=s ninth through sixteenth issues, in which he complains that
the evidence is insufficient to support the other grounds for termination found
by the jury.  See Tex. R. App. P.
47.1

2.               
Best
Interest

There
is a strong presumption that keeping a child with a parent is in the child=s best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex.
2006).  Prompt and permanent placement of
the child in a safe environment is also presumed to be in the child=s best interest.  Tex. Fam. Code Ann. ' 263.307(a) (Vernon 2002).  Nonexclusive factors that the trier of fact
in a termination case may use in determining the best interest of the child
include 

 








(1)    the desires of the child;

 

(2)    the emotional and physical needs of the
child now and in the future;

 

(3)    the emotional and physical danger to the
child now and in the future;

 

(4)    the parental abilities of the individuals
seeking custody;

 

(5)    the programs available to assist these individuals
to promote the best interest of the child;

 

(6)    the plans for the child by these individuals
or by the agency seeking custody;

 

(7)    the stability of the home or proposed
placement;

 

(8)    the acts or omissions of the parent which
may indicate that the existing parent‑child relationship is not a proper
one; and

 

(9)    any excuse for the acts or omissions of the
parent.

 

Holley v.
Adams, 544 S.W.2d
367, 371B72 (Tex. 1976).

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when
appropriate.  C.H., 89 S.W.3d at
27.  Furthermore, undisputed evidence of
just one factor may be sufficient in a particular case to support a finding
that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.








The
children did not testify, and their desires are not otherwise expressed in the
record, but Latham testified that the children developed a strong emotional
bond with Andrew, even though Andrew said he had seen them just five times
during the pendency of the case. 
Mosqueda testified that they were also bonded to and protective of their
half-sibling, Carrie.  Andrew testified
that he wanted to keep the children in contact with Carrie, but he had no plan
for doing so.

Concerning
emotional and physical danger to the children now and in the future, Yolanda=s testimony that Andrew physically
abused her and abused drugs and alcohol in the past was some evidence from
which a factfinder could infer that a danger for such abuse existed in the
future.  Andrew offered no excuse for his
behavior when he lived with Yolanda. 
Bailey testified that introducing the children to an unfamiliar person
would have a Ahigh impact@ on the children and that an unstable
home can create future emotional and behavioral problems.













Regarding
Andrew=s parenting abilities, his plans for
the children, and the stability of his home, Andrew testified about his prior
failed marriages and relationships and admitted that he was not very involved
in his six children=s lives at times.  He told the jury about his plans for the
children=s living arrangements in the home he
shared with his current wife, Sandra, and said that Sandra=s involvement with the children was
an important part of his plan, but he also admitted that he had told a
Department employee that Sandra would not share in the responsibility of caring
for the children.  Further, Sandra did
not attend visitations with Andrew, and the Department=s home study suggests she was
unenthusiastic about having Andrew=s children in her home, though Andrew said that she had
changed her mind in the five weeks before trial.  Andrew=s adult daughter, Anna, indicated that his marriage to Sandra
was a stable relationship, but the jury also heard testimony about Andrew=s trolling the Internet for sex
partners, including one online personal ad in which Andrew wrote, A[I] am in a f***** up relationship with
a woman who doesn=t love me, oh well . . .@ on May 26, 2008Cabout a month before trial.[5]  Andrew also admitted that in February 2008,
he emailed Mosqueda and told her that he wanted to give up his parental rights
and never hear from the Department again; he explained at trial that he was
frustrated because Mosqueda was meddling in his life too much.  On the other hand, by the time of trial,
Andrew had completed a drug and alcohol assessment, a psychological
examination, and a parenting class and had participated in counseling, which
tends to show that he was cooperating with the Department and working his
service plan.

Mosqueda
testified that the Department=s plan for the children was adoption
and that Amy and Bobby were in an Aadoptive placement@ foster home with their half-sister, Carrie.  The record reflects no other evidence about
the Department=s plan or the Aadoptive placement@ foster family with whom the children
were living.

Viewing
the evidence in the light most favorable to the jury=s verdict, we hold that the jury
could reasonably form a firm belief or conviction that termination of Andrew=s parental rights was in Amy=s and Bobby=s best interest; thus, the evidence
is legally sufficient to support the jury=s best-interest finding. 
See Tex. Fam. Code Ann. '161.001(2); In re J.P.B., 180 S.W.3d at 573.  Viewing the entire record, we hold that a
factfinder could reasonably form a firm conviction or belief that termination
was in the children=s best interest; thus, the evidence
is also factually sufficient.  See In
re C.H., 89 S.W.3d at 28.  We
overrule Andrew=s seventeenth through twentieth
issues.

3.               
Delayed
service of process








In
his twenty-first issue, Andrew argues that the Department=s failure to serve him with process
until eleven months after the Department filed its termination petition and
eight months before trial violated his right to due process.

A
parent is entitled to service of citation in a suit affecting the parent-child
relationship.  Tex. Fam. Code Ann. ' 102.009(7) (Vernon 2008).  The Department must exercise due diligence to
locate a parent:

(b)  If a parent
of the child has not been personally served in a suit in which the Department
of Family and Protective Services seeks termination, the department must make a
diligent effort to locate that parent.

 

. . . .

 

(e) The department shall be required to provide
evidence to the court to show what actions were taken by the department in
making a diligent effort to locate the missing parent and relative of the
missing parent.

 

Id. '  161.107 (Vernon 2008).  At the initial status hearing, the trial
court must make findings as to whether the Department has exercised due
diligence to locate all persons entitled to service.  Id. ' 263.202(a)(1) (Vernon 2008). 
And the Department must describe its efforts to locate and serve parents
in a report filed with the trial court before each permanency hearing except
the first.  Id. ' 263.303(b)(ii) (Vernon 2008).








The
record shows that the Department filed its petition on January 11, 2007,
seeking to terminate the parental rights of Andrew, Yolanda, and Daniel.  Yolanda testified that when the Department
removed the children from her home, she gave the Department investigator Andrew=s name, but she did not know where he
was living.

In
its March 9, 2007 status hearing order, the trial court noted that Andrew had
not been served and did not appear.  In
its June 13, 2007 permanency report, the Department told the trial court that
all persons entitled to service had been served.  The trial court=s June 21 permanency hearing order appears to acknowledge
that Andrew had not been served, but it merely states that A[t]he Court has evaluated . . . the
department=s efforts to obtain the assistance of
each parent to provide information necessary to locate an absent parent.@

Department
liaison officer Albert Hiller testified that when he was preparing for an
October 5 permanency hearing, he could not find any evidence that Andrew had
been served.  Hiller said he found Andrew=s address using an Internet search
engine.  At the October 5 hearing, the
trial court found that Andrew had not been served, but it also found that the
Department had exercised due diligence in attempting to locate him.








Hiller
obtained a civil citation and sent it and the suit papers to the Bexar County
sheriff=s office.  In November 2007, the sheriff=s office reported that it had made
three unsuccessful attempts to serve Andrew. 
It eventually served Andrew on December 6, 2007.  Among the papers the sheriff served on Andrew
was a notice of a January 3, 2008 hearing.

Andrew
did not file a formal answer or appear for the January 3 hearing, but he did
email the court clerk, and the trial court found that the email was sufficient
to be an answer.  At the hearing, the
trial court terminated the parent-child relationship between Carrie and her
father (who was served and did not file an answer), but it deferred Andrew=s case and extended the statutory
dismissal deadline until July 11, 2008.  See
Tex. Fam. Code Ann. ' 263.401(b) (Vernon 2008).  The Department set up a service plan for
Andrew, and the trial court eventually appointed counsel to represent
Andrew.  The trial in Andrew=s case began on June 30, 2008, about
two weeks before the extended dismissal deadline. 

Andrew
concedes that the family code does not impose a deadline for service of process
other than section 263.401=s one-year dismissal deadline.  See id. ' 263.401(a).  But he
argues that the delayed service in this case deprived him of his right to due
process under Texas and federal law by denying him a meaningful opportunity and
right to reunite with his children. Andrew did not present his due process complaint
to the trial court, but he argues that the delayed service rises to the level
of public-interest-based fundamental error that he can raise for the first time
on appeal. 








To
preserve a complaint for appellate review, a party must have presented to the
trial court a timely request, objection, or motion that states the specific
grounds for the desired ruling, if they are not apparent from the context of
the request, objection, or motion.  Tex.
R. App. P. 33.1(a); see also Tex. R. Evid. 103(a)(1).  If a party fails to do this, error is not
preserved, and the complaint is waived.  Bushell
v. Dean, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh=g).

But
error is not waived if it falls within the narrow category of Afundamental error,@ which requires no trial court
predicate for appellate review.  In re
B.L.D., 113 S.W.3d 340, 350 (Tex. 2003), cert. denied, 541 U.S. 945
(2004).  Fundamental error exists in
those instances in which error directly and adversely affects the interest of
the public generally, as that interest is declared by the statutes or
Constitution of our State, or instances in which the record affirmatively and
conclusively shows that the court rendering the judgment was without
jurisdiction of the subject matter.  Mack
Trucks, Inc. v. Tamez, 206 S.W.3d 572, 577 (Tex. 2006).








In
In re BLD, the supreme court refused to extend the fundamental error
doctrine to parental-rights termination cases, noting that such casesCunlike juvenile proceedings, to which
the fundamental error doctrine does applyCare not quasi-criminal in nature.  113 S.W.3d at 352 (declining to review
unassigned jury charge error in termination case as fundamental error).  The court further held that an alleged due
process violation does not rise to the level of fundamental error in a
termination case.  Id. at 353B54.

The
supreme court does, however, recognize fundamental error in the limited
situations Ain which error directly and adversely
affects the interest of the public generally, as that interest is declared by
the statutes or Constitution of our State.@  See Mack Trucks,
Inc., 206 S.W.3d at 577.  But when an
alleged error affects the rights of only particular litigants, as in this case,
it does not adversely affect the interest of the public generally and does not
rise to the level of fundamental error.  See
Newman v. King, 433 S.W.2d 420, 422 (Tex. 1968) (holding that error
affecting a child plaintiff=s rights affects the rights of only
the particular minor and the particular litigants, does not adversely affect
the interest of the public generally, and does not constitute fundamental error
warranting reversal in the absence of objection); see also Worden v. Worden,
148 Tex. 356, 224 S.W.2d 187, 190B91 (1949) (holding no violation of fundamental public policy
in a court=s judgment of child custody).

We
therefore hold that Andrew=s delayed-service complaint does not
rise to the level of fundamental error. 
Because he did not raise his complaint in the trial court, he waived
it.  See Tex. R. App. P. 33.1(a); Bushell,
803 S.W.2d at 712.  We overrule Andrew=s twenty-first issue.








                                             Conclusion

Having
overruled Andrew=s first through eighth and
seventeenth through twenty-first issues, and not reaching his ninth through sixteenth
issues, we affirm the trial court=s termination order.

 

PER CURIAM

 

PANEL:  GARDNER,
WALKER, and MCCOY, JJ.

 

DELIVERED: 
April 2, 2009











[1]See Tex. R. App. P. 47.4.





[2]The trial court admitted
this evidence only for the purposes of impeaching Andrew=s testimony regarding his
alcohol use.





[3]The trial court admitted
this evidence for the limited purpose of impeaching Andrew=s testimony regarding his
marital relationship.





[4]The trial court had
previously terminated Yolanda=s parental rights in November 2007 and Daniel=s parental rights in
January 2008.





[5]The trial court admitted
the personal ad in question, as well as similar ads from other Internet dating
sites, for impeachment and instructed the jury that it could consider the ad
only if the jury found that the ad did impeach Andrew=s testimony regarding his
marital relationship.